## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. ___1:21mj02203 Goodman - 3CBU___

UNITED STATES OF AMERICA

v.

JEFFERSSON ARANGO CASTELLANOS,
    a/k/a "Harry Potter,"
KENNY JULIETH URIBE CHIRAN, and
PEDRO JOSE SILVA OCHOA,
    a/k/a "Tata,"

Defendants.

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?
    _____ Yes    ___X___ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?
    _____ Yes    ___X___ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?
    _____ Yes    ___X___ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: _____

Quinshawna S. Landon
Assistant United States Attorney
Fla. Bar No. 99835
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9632
Quinshawna.Landon@usdoj.gov

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 1:21mj02203 Goodman - 3CBU |
| JEFFERSSON ARANGO CASTELLANOS, | ) | |
| a/k/a "Harry Potter," | ) | |
| KENNETH JULIETH URIBE CHIRAN, AND | ) | |
| PEDRO JOSE SILVA OCHOA, | ) | |
| a/k/a "Tata," | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT BY TELEPHONE OR RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___ March 5, 2020-March 6, 2020 ___ with the Southern District of Florida being the district in which the defendants first entered the United States, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 371; | Conspiracy to Assault an Internationally Protected Person; |
| Title 18, United States Code, Section 112(a); | Assault of an Internationally Protected Person; and |
| Title 18, United States Code, Section 1201(a)(4) and (c). | Conspiracy to Kidnap, and Kidnapping, an Internationally Protected Person. |

This criminal complaint is based on these facts:

See attached Affidavit.

☐ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Orlando Quant
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed. R. Crim. 4.1 by
_____ (specific reliable electronic means)

Date: __2/2/2021__

_____
*Judge's signature*

City and state: _____Miami, Florida_____    Hon. Jonathan Goodman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Orlando Quant, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a special agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2001. I currently serve as a SA in the International Violent Crime Squad in the Miami Division. Previously, I have also held the positions of supervisory special agent and supervisory senior resident agent. In my capacity as an FBI SA, I have investigated criminal violations of federal laws, including, but not limited to, Title 18, United States Code, Section 112 (protection of foreign officials, official guests, and internationally protected persons), and Title 18, United States Code, Section 1201 (kidnapping).

2. This Affidavit is submitted for the limited purpose of establishing probable cause that Jeffersson Arango Castellanos, a/k/a "Harry Potter," ("ARANGO"), Kenny Julieth Uribe Chiran ("URIBE") and Pedro Jose Silva Ochoa, a/k/a "Tata," ("SILVA") did knowingly and intentionally: (1) conspire to assault an internationally protected person, in violation of Title 18, United States Code, Section 371; (2) assault an internationally protected person, in violation of Title 18, United States Code, Section 112(a); and (3) conspire to kidnap, and did kidnap, an internationally protected person, in violation of Title 18, United States Code, Sections 1201(a)(4) and (c).

3. The statements contained in this Affidavit are based on my personal knowledge, as well as information provided to me by other law enforcement officers, including those based in Colombia, law enforcement support personnel, and civilian witnesses. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, it does not include every fact known to me in connection with this investigation. I have only set forth the

facts that I believe are necessary to establish probable cause for the offenses described in this Affidavit.

## JURISDICTION

4.      On or about March 5, 2020, throughout all times relevant to this Affidavit, Victims 1 and 2 were Active Duty United States Army Soldiers.  Additionally, at all times relevant to this complaint the victims were present in Bogota, Colombia, as part of their official duties and were granted non-accredited personnel status in accordance with Article 5 of the 1974 Status of Forces Agreement ("SOFA") between the United States and Colombia.  They were thus entitled to equivalent administrative and technical privileges and immunities, and are considered Internationally Protected Persons as defined in Title 18, United States Code, Section 1116(b)(4)(B).  Accordingly, this Court has jurisdiction under Title 18, United States Code, Section 1201(e)(1) and Title 18, United States Code, Section 112(e)(1), which provides that jurisdiction is appropriate when a victim is a representative, officer, employee, or agent of the United States.

## PROBABLE CAUSE

5.      On or about March 5, 2020, Victim 1 and Victim 2, went to the Zona T area of Bogota, Colombia (an upscale area of bars, restaurants, and retail shops), to watch a soccer game at a bar.  Both soldiers failed to return to their apartments by the following morning, and later that afternoon, they were reported missing after not reporting for work.

6.      On the morning of March 6, 2020, a woman called Colombia 123 (the equivalent of calling 911 in the United States) to report that she observed a man, later identified as Victim 1, stumbling and falling down as he made his way down the street.  At one point, Victim 1 fell down,

striking his face on the pavement. A Colombian National Police ("CNP") patrol unit located Victim 1 near the intersection of Carrera 34 and Calle 25A.

7. After assessing Victim 1, the CNP officer believed that Victim 1 was either drunk, drugged, or a combination of both. The officer, who had arrived on a motorcycle, called their dispatch to request that a marked sedan unit be sent to the location. CNP officers transported Victim 1 to Clinica Samper Mendoza, which is a medical clinic in the area. A few hours later, Victim 1 regained consciousness, but he did not know where he was or how he had gotten to the clinic.

8. That afternoon, Victim 1 was released from the clinic. He took a taxi to his temporary duty apartment, where an Embassy driver, who had been sent to the apartment in case either of the two soldiers returned, was waiting. The Embassy driver contacted a SA working for the U.S. Force Protection Detachment ("FPD"), who instructed him to take Victim 1 to Hospital Universitario Fundacion Santa Fe De Bogota ("Hospital Universitario").

9. Department of Defense ("DoD") personnel, who were looking for both victims, found Victim 2 in his apartment sometime that afternoon. DoD personnel assessed Victim 2 and determined that he had been drugged. The SA of the FPD arrived at the apartment, spoke with Victim 2, and came to the same conclusion. The SA of the FPD requested that DoD personnel transport Victim 2 to Hospital Universitario. Victim 2 could not remember how he had arrived at the apartment and noticed that his wallet, belt, jacket and two cell phones were missing.

10. Once at the hospital, a toxicology screen was conducted on both victims, which confirmed the presence of benzodiazepines (a class of psychoactive drugs that are commonly used as tranquilizers). Medical personnel also noted that both victims had contusions and abrasions on their faces and/or bodies.

3

11.     According to Victims 1 and 2, several of their valuable possessions were also missing, including money, credit and debit cards, identification, four cellular phones, a watch, a gold chain, belts and their jackets.  There were also several unauthorized transactions on both victims' debit/credit cards from that morning.  The victims did not know what happened to their valuables or how they had incurred the bruises and abrasions on their bodies.

12.     In fact, Victims 1 and 2 had very little memory of what happened to them the night before.  The last location they remembered going to was the Colombian Pub (the "Pub"), a bar in the Zona T area.  The victims recounted buying a couple of beers, listening to music, and dancing by themselves.  Victim 1 remembered seeing two women taking "selfies", and that he offered to take photos for them.  He recalled asking if he could place his beer on their table to take the photos.  Neither victim could remember what happened after that encounter.

### Follow-Up Investigation

13.     As part of its investigation, the CNP collected video surveillance and vouchers/receipts from the last establishments the victims remembered patronizing and the businesses and ATMs in which the victims' debit/credit cards were used.  After analyzing the evidence, law enforcement, in part, determined the following:

14.     On March 5, 2020, at approximately 10:46 p.m., video surveillance showed ARANGO and URIBE, both Colombian nationals, walking down the street towards the general direction of the Pub.  A few minutes later, at approximately 11:04 p.m. and 11:25 p.m., video surveillance showed ARANGO and URIBE inside the Pub, respectively.  The victims arrived at the Pub at approximately 11:09 p.m.  In the early morning hours, on March 6, 2020, at approximately 1:25 a.m., video surveillance showed Victim 2 dancing with an unknown female in the back-right hand corner of the pub. At approximately 1:46 a.m., video surveillance showed that

4

as Victim 1 attempted to approach an unidentified female, ARANGO walked up, placed his arm around Victim 1's shoulders, and directed Victim 1 towards the rear of the Pub. Victim 1 moved away from ARANGO, and ARANGO, again, placed his arm around Victim 1 and directed Victim 1 towards the rear of the Pub.

15.     At approximately 2:07 a.m., video surveillance showed Victim 1 stumbling as he walked towards the entrance/exit of the Pub. ARANGO, who was dressed in a reddish-colored polo shirt with a white collar, blue ripped jeans, and bright white sneakers, followed Victim 1 out. A few minutes later, ARANGO returned alone and walked to the back-right hand corner of the Pub, where Victim 2 was still located. At around 2:24 a.m., ARANGO, this time wearing a brown jacket (in addition to the clothing described above) and carrying a translucent bottle, walked to the middle of the Pub and waited for a moment. As Victim 2 approached him, ARANGO walked out directly in front of Victim 2 while URIBE and an unknown male followed behind Victim 2.

16.     At approximately 2:34 a.m., video surveillance showed ARANGO, URIBE and Victims 1 and 2 as they walked together down the street. Victims 1 and 2 were stumbling and having difficulty keeping their balance. URIBE had her arm around the waist of Victim 1 and he had his arm on her shoulders, as he struggled to walk. At one point, Victim 2 almost ran into the back of Victim 1 and URIBE. At approximately 2:43 a.m., URIBE and Victims 1 and 2 got into a vehicle, which closely resembled a Renault 9, through the rear driver side door, as ARANGO walked towards a street vendor. Soon afterwards, ARANGO got into the car using the front passenger door. The vehicle then drove off.

17.     Subsequently, during the early morning hours of March 6, 2020, video surveillance showed ARANGO going into ATM booths, using a debit card to withdraw or attempt to withdraw cash, and getting into the vehicle described above using the front and rear passenger doors.

18.     At approximately 6:44 a.m., video surveillance showed Victim 1 stumbling and falling down onto the street on Calle 25.   ARANGO, who was still wearing the reddish-colored shirt, blue ripped jeans, bright white sneakers, and brown jacket, walked up to Victim 1, assisted in lifting him up, and guided him back to the sidewalk while appearing to talk to him.  Within a minute, ARANGO left Victim 1 as Victim 1 continued to stumble and fall down onto the street.

19.     At approximately 7:21 a.m., video surveillance showed ARANGO and URIBE walking into the Calima Shopping Center.  ARANGO used a credit card to pay for a drink and another item.   A review of Victim 1's American Express credit card revealed that his card was fraudulently used at Tostao Cafe, Calima Shopping Center, at 7:25 a.m., on March 6, 2020.

20.     A few minutes later, video surveillance further showed ARANGO and URIBE using the Banco Popular ATM that is located within the same shopping center.  ARANGO can be seen withdrawing money using Victim 2's debit card.   I know that the card belongs to Victim 2 because Banco Popular has a video system that displays the following information on the video screen each time the ATM is used:  the type of operation, the terminal ID, the date of the transaction, the transaction time, the receipt number, the card number, the account number, and the value of the transaction.  When ARANGO used the ATM, Victim 2's debit card information flashed on the screen.  After ARANGO and URIBE used the ATM, they left the mall at around 7:55 a.m.

21.     After reviewing the video surveillance, the CNP showed a confidential source, who had previously reported on similar crimes, photographs of the man depicted in the surveillance videos from the ATMs.  The confidential source identified the man who used the victims' credit/debit cards as ARANGO.  Based on this information, the CNP, in accordance with Colombian law, began to intercept real-time communications to and from ARANGO'S phone.

During the wire intercept, CNP identified other cellular phones that were in contact with ARANGO, and whose users discussed relevant criminal activity with him. CNP analysts conducted additional research and identified the registered subscribers for those phones. In accordance with Colombian law, CNP also obtained approval to intercept communications to and from those phones.

22.     The results of the phone intercepts revealed that ARANGO, URIBE, and SILVA, who is also a Colombian national and who was later identified as a member of the conspiracy, were engaged in a scheme in which they frequented bars and restaurants to identify victims they could drug in order to steal their money and other belongings. For instance, in one call, ARANGO was upset because he was "living on the minimum." He stated that, due to the COVID-19 pandemic, all of the bars and restaurants were closed and he was waiting for them to open so that he could go out and work. I believe that ARANGO meant that he no longer had money because he wasn't able to continue engaging in his criminal scheme and that he needed to resume his criminal activities.

23.     In another conversation, ARANGO and SILVA discussed how they were concerned because the bars were still closed. They planned to look for bars that might be operating behind closed doors so that they could find victims. In a separate conversation, ARANGO told a woman that he conducts "Tomaseas." Based on my training and experience, the term "tomaseas" is Colombian slang for adding a drug to people's drinks.

24.     In another intercepted communication, ARANGO had a conversation with SILVA in which he stated that bars were starting to open and directed SILVA to check them out. SILVA replied that he had already contacted URIBE who stated that she was ready for whatever came up. SILVA also relayed that URIBE had two other women who were ready to work as well.

7

25.     In yet another intercept, SILVA confirmed to an unidentified man that he works with ARANGO and a "pelada," a Colombian slang term used to refer to a woman.  SILVA discussed how they went out to look for money and shared the proceeds equally.  SILVA also mentioned that his car had recently been impounded by the police and that he needed to make an appointment to pay the fines and storage fees.  In another call, he confirmed the tag number of the car he was driving and stated that the car belonged to his son.   During their calls, SILVA and ARANGO also discussed that the vehicle was a "tool" for work.

26.     The CNP researched the incident in which SILVA stated that the car was impounded.  The CNP determined that the traffic infraction occurred on May 11, 2020, and that the car SILVA was driving was a Renault 9.   The car is substantially similar in color, make, and model to the car in which video surveillance showed ARANGO, URIBE, and Victims 1 and 2 getting into after they left the Pub in the early morning hours on March 6, 2020.

27.     On December 30, 2020, the Colombian authorities arrested and detained ARANGO and URIBE on charges unrelated to Victims 1 and 2, but that similarly involved the alleged drugging of a victim.  I conducted an interview of ARANGO, which took place in Bogota, Colombia.  I provided ARANGO with an Overseas Advice of Rights form[1] and advised him that I wanted to discuss a matter that was unrelated to the arrest on his current charges.  After reading the form and stating that he understood his rights, ARANGO voluntarily agreed to speak with me and waived his rights.  The interview was conducted in Spanish and was audio and video recorded.

---

[1] An Overseas Advice of Rights Form advises suspects that, although they are not in the United States, they are still entitled to certain rights under United States law.  Additionally, the form informs suspects that they have a right to remain silent, speak with an attorney, and have an attorney present while speaking with United States law enforcement.  Lastly, the form explains that the United States cannot guarantee that local authorities in the host country will permit suspects to have access to an attorney, but suspects can refuse to agree to an interview or stop an interview at any time.

28.     During the interview, ARANGO admitted to drugging and robbing Victims 1 and 2. He stated that he only remembered some of the details. ARANGO advised that on the night of the incident he was working with SILVA and URIBE. He stated SILVA, who was driving an older model Renault, picked up URIBE and ARANGO at separate locations and dropped them off in the Zona T area. ARANGO and URIBE decided to go to the Pub to look for victims. He stated that they selected their targets based on how the individuals dressed and acted, and by analyzing who will generate an income for them. ARANGO stated "So, uh, uh, well we obviously – drugged that gu[y] – I mean we obviously go crazy." According to ARANGO, SILVA remained in the car but stayed in the area to wait for him to call when their victims were ready to be picked up.

29.     Initially, ARANGO advised that on the night of the incident, he first ran into one of the victims in the bathroom at the Pub, where ARANGO was snorting cocaine. ARANGO added that the victim asked him if he could have some of it, then the two snorted cocaine together. Based on my investigation, however, I do not believe this statement is true. The victims' urine samples, which were taken the morning after the incident, and submitted for a toxicology screening did not identify any traces of cocaine in their systems. Additionally, based on my training and experience, I know that cocaine stays in an individual's system for at least two to three days.

30.     Later, ARANGO stated that he placed the liquid form of the drug Zolpidem in both of the victims' drinks and gradually increased the number of drops throughout the night as he gauged how the victims were reacting to the drug. ARANGO stated that he placed a total of five drops into each of the victims' drinks. He also said that he put the paste form of the drug in each of their drinks as well. I am aware that Ambien is the brand name of Zolpidem, and it is a sedative-hypnotic. Zolpidem is not a benzodiazepine.

9

31.     When I advised ARANGO that the victims' toxicology report did not show that they had the drug Zolpidem in their systems, but only Clonazepam, which is a benzodiazepine, he stated that Zolpidem and Zopiclone are derivatives of Clonazepam, and that he (ARANGO) takes Rivotril, which is another name for Clonazepam.  Based on my training and experience, I know that Zolpidem and Zopiclone are not derivatives of Clonazepam.  I am also aware that the victims tested positive for the presence of the benzodiazepine Clonazepam.

32.     ARANGO further recounted that they all started partying and he took advantage of the situation to rob the victims.  He remembered escorting both victims, whom he described as being "pretty messed up," out of the Pub and taking them to the "El Encanto" hotel in the Santa Fe area of Bogota.  ARANGO stated that at the hotel, he, URIBE and the two victims continued to ingest cocaine and were later joined by SILVA.  ARANGO stated that by this time, the victims could no longer walk.   Again, based on my investigation, I believe that the statement about the victims ingesting cocaine is a self-serving statement because the toxicology reports showed that the only drug in the victims' systems were benzodiazepines. Cocaine is not a benzodiazepine.

33.     ARANGO went on to describe how he obtained Victim 2's debit card pin number. He stated that the effect of the drug made the victims think that he was their best friend and he took advantage of their condition by pretending that the victims had to pay for something, for example, the cost of the hotel.  ARANGO advised that he told one of the victims that he needed the victim to enter a pin number so that he could pay the bill.  ARANGO then handed the victim a cell phone, pretending it was a credit card machine, and Victim 2 entered his pin number into the cell phone, which appeared on the screen.  ARANGO also recalled stealing between four and six cell phones from the victims.[2]

---

[2] The victims had a total of four phones in their possession.

34. ARANGO stated that he used the victims' cards at different locations and eventually dropped each victim off by the side of the road, but at different places. ARANGO advised that he tried to leave the victims in a seated position because they were still under the effect of the drug and were still out of it. ARANGO could not remember some of the locations where he used the cards, but once he was shown photos of the places that he visited that night, he confirmed that he had been there to use the victims' cards to withdraw, or attempt to withdraw, money.

35. I have reviewed the Colombian national identification cards ("cedulas") belonging to ARANGO, URIBE, and SILVA. I examined the photographs associated with each card and recognized ARANGO and URIBE to be the same individuals that I observed in the video surveillance footage described above. I also reviewed a series of intercepted phone calls wherein SILVA communicated to another person that he [SILVA] goes by the nickname "Tata," but his true name is "Pedro." As described above, SILVA further stated that he had recently been issued a citation by transit police on May 11, 2020, for violating Covid-19 quarantine restrictions and that his vehicle, bearing the number tag ATE-282, had been impounded. SILVA also stated in a phone call that his cedula number was 79.810.493. I have confirmed that this is in fact SILVA's cedula number and that the phone number used to intercept this information is the same phone number listed on SILVA's cedula. Finally, during the intercept, SILVA confirmed the impounded vehicle was a 1988 Renault 9.

[This Space Intentionally Left Blank]

## CONCLUSION

36.     Based upon the aforementioned information, there is probable cause to believe that

ARANGO, URIBE, and SILVA did knowingly and intentionally: (1) conspire to assault an

internationally protected person, which resulted in bodily injury, in violation of Title 18, United

States Code, Section 371; (2) assault an internationally protected person, which resulted in bodily

injury, in violation of Title 18, United States Code, Section 112; and (3) conspire to kidnap, and

did kidnap, an internationally protected person, in violation of Title 18, United States Code,

Section 1201(a)(4) and (c).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Orlando Quant, Special Agent
Federal Bureau of Investigation


Attested to by the Applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by FaceTime this 2nd th day of February, 2021,
in Miami, Florida.

HON. JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE

12