UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-20173-MOORE

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

JEFFERSSON ARANGO CASTELLANOS,
    a/k/a "Harry Potter"

      Defendant.
_____/

FILED BY _____ D.C.
MAY 24 2024
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES' SENTENCING MEMORANDUM

    The United States of America, by and through the undersigned counsel, hereby files this Sentencing Memorandum to assist the Court in fashioning the appropriate sentence for the defendant, Jeffersson Arango Castellanos. The defendant comes before the Court for sentencing after pleading to the six counts in his Indictment, including: one count of Conspiracy to Kidnap an Internationally Protected Person, in violation of 18 U.S.C. § 1201(c); two counts of Kidnapping, in violation of 18 U.S.C. 1201(a)(4); one count of Conspiracy to Assault and Internationally Protected Person, in violation of 18 U.S.C. § 371; and two counts of Assaulting an Internationally Protected Person, in violation of 18 U.S.C. § 112(a).

    The United States recommends the Court adopt the findings and Guideline calculations in the Presentence Investigation Report ("PSR"), with the exception of noting the guideline range for an offense level of 41 and Criminal history of I is 324 to 405 months.[1] DE 64. For the reasons

---

[1] The PSR calculated the defendant's Total Offence Level at 41 and reported the guideline imprisonment range as 360 months to life (PSR ¶ 92; 156). As noted by the defendant, and corrected in the Second Addendum to the PSR,

1

stated herein the United States respectfully asks the Court to impose a sentence of incarceration of 360 months (30 years), which is the middle of the advisory Guideline range of 324-405 months, three years supervised release, restitution in the amount of $24,115, and a special assessment.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

On February 2, 2021, the defendant and his co-conspirators were charged by Complaint for the above offenses, and arrest warrants were issued for them. DE 1. Subsequently, the United States requested their extradition from the Government of Colombia.

On April 20, 2023, a grand jury in the Southern District of Florida returned an Indictment charging the defendant and his co-conspirators with the above listed offenses. DE 4.

On May 7, 2023, the defendant was extradited to the United States from Colombia; on May 8, 2023, he had his initial appearance in this case. DE 7.

On September 9, 2023, after the defendant asserted his intention to plead guilty to the charged offenses, the Court referred the case to Magistrate Judge Lauren F. Louis to take all necessary and proper action as required by law to prepare a Report and Recommendation regarding the defendant's change of plea. DE 27.

On January 26, 2024, following the defendant's competency evaluation, the defendant pled guilty to the six counts in his indictment. DE 45. As detailed in the PSR and Factual Proffer (DE 47), the defendant's crimes involve an iteration of an ongoing scheme, whereby, on March 5-6, 2020, he and his co-conspirators incapacitated two victims, U.S. Service members serving on orders in Colombia, by placing drugs—benzodiazepines—in their drinks. Afterwards, they took the victims' possessions and manipulated one of them to provide his PIN number for his ATM

---

the guideline imprisonment range for a defendant with an offense level of 41 and Criminal history of I (like the defendant) is 324 to 405 months. Defendant's Objections, DE 59 at 8; PSR Second Addendum, DE 64-2 at 9; USSG § 5A (Sentencing Table).

2

card. The defendant and his co-conspirators then went around Bogota, Colombia, using the victims' ATM and credit cards. The defendant and his co-conspirators ultimately discarded the victims in separate locations in Bogota, leaving them to fend for themselves in an incapacitated state.

Also on January 26, 2024, Magistrate Judge Louis filed the Report and Recommendation, recommending this Court accept the defendant's guilty plea. DE 46. On February 12, 2024, the Court adopted the Report and Recommendation and found the defendant guilty of Counts 1 through 6 of the Indictment. DE 49.

## II.   SENTENCING LAW

When imposing a sentence, district courts must first calculate the applicable Sentencing Guidelines range and then consider and balance the sentencing factors set forth in Title 18, United States Code, § 3553(a) to make an individualized assessment of the facts presented in determining an appropriate sentence. *United States v. Livesay*, 525 F.3d 1081, 1089-90 (11th Cir. 2008)(citations omitted). Specifically, § 3553(a) provides that courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in § 3553(a) include the need for the sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; and protect the public from further crimes of the defendant; as well as consider the kinds of sentences available; the sentencing range; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a). After considering the § 3553(a) factors here, this Court should impose a sentence of 30-year incarceration, three years supervised release, restitution in the amount of $24,115, and a special assessment.

### III.     SENTENCING GUIDELINGS

#### a. Specific Offense Characteristics

(1) <u>Serious Bodily Injury</u>.  The victims sustained serious bodily injury, allowing for a two-point enhancement pursuant to USSG § 2A4.1(b)(2)(B).  PSR at ¶¶ 72, 79.  Serious bodily injury includes injury requiring medical intervention such as hospitalization.  USSG §§ 2A4.1.n.1; 1B1.1.n.1(M).  Both victims were taken to the hospital while awakening from their drug induced states after they were recovered from the defendant's kidnapping.  One of the victims even tells a harrowing tale of regaining consciousness in an unknown hospital, where Colombia National Police (CNP) members brought him after he was first found incoherent on the streets.  PSR at ¶12.  After he woke in a confused state, hospital staff ultimately tied him to his bed, triggering his military training on escape.  (Jeffersson-0614.)  He ultimately left this hospital and reunited with U.S. personnel, who brought to another hospital where he received additional medical care from the same providers who treated the other victim.  PSR at ¶13, 14.

(2) <u>Sexual Exploitation</u>.  Mr. Arango is accountable for the six-point sentencing enhancement pursuant to USSG § 2A4.1(b)(5) as the two victims were sexually exploited during the commission of the kidnapping.  PSR at ¶¶ 73, 80.  Although neither victim remembers the events of their kidnapping on March 5-6, 2020, due to the defendant drugging them with benzodiazepines, the victims' accounts and context of the offenses nonetheless show that the fact of the sexual assault is "more probable than its nonexistence" and is therefore sufficient to find the sexual assault enhancement applicable by a preponderance of the evidence.  *U.S. v. Owens*, 96 F.4h 1316, 1321 (11th Cir. 2024) (citations omitted).

On May 7, 2020, the day following their recovery, both victims felt pain in their anus areas and spoke about it with each other.  (Jeffersson-0614-15; Jeffersson-0643.)  Prior to this

4

conversation, one of the victims recalled taking a shower and feeling moisture in his anus area, not due to water but more like semen on his skin, and also felt discomfort in his anus area. (Jeffersson-0614-15.)

On March 9, 2020, two full days after they were kidnapped, both victims returned to the Hospital Universidad in Bogota to undergo a sexual assault exam.[2]

The next day, on March 10, 2020—three full days after their kidnapping—the victims both arrived in Fort Bragg, North Carolina, where they underwent a sexual assault forensic examination. PSR at ¶ 18. The results of the examination likewise led to inconclusive results about sexual assault and did not provide objective evidence to corroborate the victims' accounts.

Consequently, the claims of sexual assault largely rest of the victims' recognizing soreness in their anus areas the day after they were released and one of the victims recognizing moisture, not due to water, in his anus area while showering. Notably, the lack of corroborating evidence to support these claims is largely due to the manner in which the defendant and his co-conspirators carried out the kidnapping, namely rendering the victims unconscious through drugging them, which impaired their ability to recall what was done to them, particularly when they first received medical attention. Once they pieced together that they were assaulted through soreness in specific areas, days had passed since the assault before they were able to get medical treatment or collect

---

[2] Although the results of any testing were not conclusive, their medical reports both include the following notation: "DIAGNOSTICOS 2020/03/09 - (Y0S0) AGRESION SEXUAL CON FUERZA CORPORAL, VIVIENDA, APARTAMENTO, CASA (RESIDENCIAL), CASA RODANTE- RESIDENCIAL, GARAJE-JARDIN-PATIO-SENDERO-GRANJA, DE RESIDENCIA PRIVADA, LUGAR DE RESIDENCIA NO INSTITUCIONAL, PENSION, - Impresión." (Jeffersson-02170, 02185) (Roughly translated to English as: "DIAGNOSES 2020/03/09 - (Y0S0) SEXUAL ASSAULT WITH BODILY FORCE, HOUSING, APARTMENT, HOUSE (RESIDENTIAL), RESIDENTIAL MOBILE HOME, GARAGE-GARDEN-YARD-PATH-FARM, PRIVATE RESIDENCE, PLACE OF RESIDENCE NOT INSTITUTIONAL, PENSION, - Impresión." Medical reports from one of the victims includes an additional, similar, notation under the "DIAGNOSTICOS" section, providing "2020/03/09 – (T742) ABUSO SEXUAL – Impresión." (Jeffersson-02185). (Roughly translated to English as "2020/03/09 – (T742) SEXUAL ABUSE – Impression.") Both CNP and FBI understood the medical professionals to have confirmed a sex assault occurred and reported it as such. (Jeffersson-02120; 02125; 02289; 01332, ¶¶6-7 (Translation); 01334 ¶ 16 (Translation)).

evidence. Indeed, one of the victims was in the shower—unwittingly washing away likely evidence—when he realized the likelihood of an assault.

The defendant contends that the detailed accounting of his actions through video of his whereabouts excludes the possibility that he or his co-defendants could have assaulted the victims. defendant's Objections, DE 59, at 4-5. However, despite the number of instances where video cameras link the defendant to these crimes, ample time remained throughout the night when the defendant and his co-conspirators could have assaulted the victims. Notably, the defendant is unaccounted for close to an hour between when a camera records him at 2:34 a.m. helping the victims get into Silva-Ochoa's car and 3:40 a.m. when a camera records him at an ATM vestibule attempting to use the victim's ATM card. (Jeffersson-01435, 01419.)

Notably, the defendant himself admitted that he and his co-defendants brought the victims to a hotel room after leaving the Colombian Pub where they duped the victim to providing his PIN number. (PSR at ¶45; Jeffersson-03989 (Translation)). When asked whether any assaults took place there, the defendant denied sexually assaulting the victims and at one point attempted to redirect the conversation by making unlikely and unreliable claims about a supposed sexual arrangement one of the victims had with co-defendant Chiran Uribe, of which he only heard but did not see, even in a small hotel room. (Jeffersson-03994, 4030, 4033.) Nonetheless, the opportunity existed for the defendant and his co-conspirators to have assaulted the victims, as the victims believed happened.

Additionally, two other significant gaps in time exist around the multiple recordings of the defendant where he or his co-conspirators could have assaulted the victims. At approximately 3:40 a.m., the defendant is caught on camera entering Silva Ochoa's car after having used an ATM machine with the victim's ATM card. (Jeffersson-01429-30.) He is next caught on a separate

6

camera close to two hours later at approximately 5:30 a.m. using a separate ATM machine with the victim's ATM card. (Jeffersson-01491.) Another unaccounted-for hour exists between approximately 5:50 a.m. when co-defendant's Silva Ochoa's car is seen driving around and approximately 6:45 a.m. when the defendant is recorded dropping off one of the victims on the side of a random street in Bogota. (Jeffersson-01429-30; Jeffersson-03070, Screenshot of video XVR_ch1_main_20200306064455_2020030606 4556.) Accordingly, the defendant and his co-defendants had multiple opportunities to sexually assault the victims throughout the course of the kidnapping.

The enhancement is also applicable to the defendant as an act he "committed, aided, or abetted." USSG §1B1.3(a)(1)(A). Video recordings show that the defendant spent the whole morning of March 6, 2020, with his two co-defendants—from the time he helped the victims get in Silva Ochoa's car to when he discarded them on the streets. The evidence shows that the victims were assaulted by at least one of the three co-defendants during this window. The sexual assault was not an act that occurred by a co-conspirator on a different day, at a different location, or in a different time outside of the defendant's presence such that it is analyzed by the scope of a joint criminal activity pursuant to USSG 1B1.3(a)(1)(B). Rather, the sexual assault occurred on the same day and during the kidnapping. Even if he did not assault the victims himself, the defendant aided and abetted the assault through rendering the victims unconscious such that they could be assaulted in his presence.

Even if analyzed under USSG § 1B1.3(a)(1)(B), the enhancement is still applicable to the defendant through the actions of co-conspirators. The sexual assault is conduct (1) within the scope of the jointly undertaken criminal activity, (2) in furtherance of that activity, and (3) reasonably foreseeable in connection with that activity. USSG § 1B1.3(a)(1)(B). At least two

7

recorded phone calls show that members of the larger conspiracy committed sexual assaults in addition to robbing victims as part of their scheme. In one call on April 6, 2020, an uncharged co-conspirator using the defendant's phone spoke about using a "travesti" to sexually molest an individual and videotape it. (Jeffersson-02757; Jeffersson-0302 (Translation).) In another call on July 13, 2020, co-defendant Silva Ochoa spoke with someone about one of two bars operating behind closed doors that took in victims, stole from them, sexually assaulted them, and threw them to the street. (Jeffersson-02785; Jeffersson-0306 (Translation).) While the defendant should be held accountable for the assault from his specific acts, the facts nonetheless support a determination that the scope of defendant's jointly undertaken criminal activity included sexual assaults and that sexually assaulting the two victims in this case was in furtherance of the criminal activity and reasonably foreseeable in connection with that criminal activity. USSG § 1B1.3(1)(B).

b. **Adjustment for Role in the Offense**

<u>Organizer, Leader, Manager or Supervisor</u>. The defendant's role as a manager, leader, supervisor or organizer – or, at the least, for exercising management responsibilities over the activities of the criminal organization – provides the basis for a two-point enhancement pursuant to USSG § 3B1.1(c). PSR at ¶ 55. For the adjustment to apply, "the defendant must have been the organizer, leader, manager or supervisor of one or more other participants;" and "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." USSG § 3B1.1(c) n.2, 4. While either other co-defendant, Uribe Chiran or Silva Ochoa, could also have acted in this capacity, the defendant showed himself to be a leader, supervisor, organizer through his "decision-making authority, the nature of his participation in the commission of the offense, the recruitment of accomplices, . . . the degree of participation in

8

planning or organizing the offenses, and the degree of control and authority exercised over others." *See* USSG § 3B1.1(c) n.2, 4.

At the outset, the defendant's actions in carrying out the crimes show him in a leadership role among his co-conspirators, namely actually drugging the victims, tricking them into providing PIN numbers, making the withdrawals and purchases with their debit and credit cards, and assisting at least one of the victims to sit down on a city sidewalk when the group abandoned him. While all co-conspirators are responsible for these actions the defendant actually carried them out, thereby showing that the defendant exercised control and discretion over the group's commission of the offenses.

Additionally, intercepted calls from after the offense further show the defendant's leadership, management, or exercise of management responsibilities over for the group. In those calls, he spoke with co-conspirators, including Silva Ochoa, about where to find additional work and alternate locations to carry out their crimes because many bars were closed due to the COVID pandemic. Moreover, he directed Silva Ochoa on where to conduct reconnaissance on possible areas to carry out their crimes. Specifically, on May 28, 2020, the defendant told Silva Ochoa that businesses have opened in the north and directed Silva Ochoa to go to them and find out which businesses are open; Silva Ochoa informed the defendant that "Kenny" (Uribe Chiran) is ready to work and has contacted two other girls who want to work. (Jeffersson-02767; Jeffersson-0304 (Translation).) The defendant also discussed new potential recruits with Silva Ochoa. For instance, on July 30, 2020, Silva Ochoa informed the defendant about a woman who wanted to work, and the defendant asked how old she is and talked about people who can make fake identification cards. (Jeffersson-02774; Jeffersson-0305 (Translation).) Additionally, the defendant demonstrated a large degree of participation in planning crimes and authority over

9

others. As an example, on June 25, 2020, the defendant told Silva Ochoa that he needed Uribe Chiran to offer sexual services to men to facilitate their criminal activity. (Jeffersson-02784-85; Jeffersson-0306 (Translation).)

IV. **ANALYSIS OF SENTENCING FACTORS AND RECOMMENDATION**

a. **Nature and Circumstances of the Offenses and History and Characteristics of the Defendant**

First, the nature and circumstances of the defendant's crimes demonstrate that he is an experienced professional in kidnapping and assaulting people, risking his victims' health and well-being for his own personal gain. In the instant offense, the defendant and his co-conspirators targeted the two victims and slipped them drugs without the victims' knowledge. When the victims were incapacitated, the defendant manipulated at least one of them into providing his PIN code to his ATM card. Once armed with access to the victim's bank account, the defendant and his co-conspirators immediately exploited their advantage, using the victims' ATM and credit cards to make cash withdrawals and large purchases. Once the victims no longer served a useful purpose, the defendant and his co-conspirators discarded them on the side of a road to fend for themselves in an incapacitated state.

As a result of their kidnapping, the victims had to leave Colombia much earlier than planned, which itself imposed a significant financial loss. Further, the effects of the defendant's crimes on at least one of the victims has been devastating and had long-term consequences. Since his kidnapping, the victim has since contended with a series of negative effects from the defendant's crimes, including multiple "mental health illness[es, . . . ] difficulty sleeping, fear, insecurity, avoidance of certain places, changes in routines, [and] strained relationships leading to divorce." PSR at ¶58. In addition to these traumatic emotional and physical tolls, the victim has further suffered long term financial loss as a result of these crimes. Up to the moment of the crime,

the victim had had a long career in the U.S. military, which he planned to continue to his chosen age of retirement. Instead, as he reported, "[t]he ongoing physical and mental health consequences forced him into early retirement . . . disrupting his planned career trajectory by three to four years." *Id.* at ¶59. As a result, this victim has lost a staggering $199,535 from his projected retirement and now lives with increased anxiety of financial insecurity as a result of the defendant's crimes.

Worse, the victims in this case were part of just one episode of the defendant's ongoing criminal scheme. The defendant admitted his crimes here were part of a larger conspiracy. DE 46. Recorded phone calls from the investigation corroborate that admission. PSR at ¶ 36. In one call, he complained about "living on the minimum," in the midst of the pandemic closing many of the bars in the area. *Id* at ¶ 37. Conversations with co-defendant Silva Ochoa show his plotting to find new bars that were open and later directed Silva Ochoa to conduct surveillance on an area where they thought bars were opening. *Id* at ¶ 38, 40. In another call, he told an unnamed woman that he conducts "Tomaseas," Colombian slang for adding drugs to people's drinks. *Id* at ¶ 38.

In line with this criminal scheme, the defendant was incarcerated in Colombia from December 24, 2020, until his extradition for similar conduct leading to a victim's death. His foreign conviction is not counted as part of the defendant's criminal history. *See* USSG § 4A1.2(h). Nonetheless, it is appropriate for this Court to be aware of it as part of the defendant's history and characteristics.

Moreover, there is ample evidence of the defendant's Colombian conviction for the Court to take this into account. Mainly, Colombia's decision to extradite the defendant to the United States addresses the defendant's pending sentence from that conviction when agreeing to extradite him:

> **ARTICLE TWO: *Not to delay* the surrender of Colombian citizen JEFFERSSON ARANGO CASTELLANOS on account of File No.**

> *110016000000202100119, in which he was sentenced in accordance with the plea bargain he made with the representative of the Office of the Attorney General to 34 years in prison, through judgment of September 27, 2022, handed down by the Eighth Criminal Court of the Bogota Special Circuit, for the punishable acts of aggravated homicide, aggravated kidnapping for extortion, and aggravated larceny, in acts that took place on November 15, 2020, . . ..*

DE 20-1 at 4; DE 20-2 at 4 (Translation). The defendant takes issue with the Court considering this information based on the defendant's own statements and public reporting about the incident. Defendant's Objections, DE 59, at 7-8. However, the Court is permitted to consider those sources and both of them corroborate facts already at the Court's disposal. Significantly, the conviction underscores the fact that the defendant's ongoing criminal acts have caused real harm people, and the significant harm caused to the two victims in the case are from only one instance of the defendant's scheme.

      b. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant**

Second, the need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant all support the imposition of a sentence at the top of his guideline range. *See* 18 U.S.C. § 3553(a)(2)(a)-(c). Here, the defendant's crimes are undoubtedly serious. The two victims were strangers to the defendant and his co-conspirators. The defendant and his co-conspirators perpetrated a frightening and dangerous crime against the victims, using drugs to incapacitate them, kidnapping them, taking their possessions, and discarding them. Although the defendant is a Colombian national being held accountable in the United States for crimes committed in Colombia, deterrence plays no less of a role here than it does in any violent crime committed in the United States.

As to specific deterrence, a long sentence will at least keep the defendant from inflicting harm on others while serving his sentence of confinement. As to general deterrence, a hefty sentence sends a message that these crimes are reprehensible and will be taken seriously. The defendant works with others in this ongoing criminal enterprise; his conspirators—and others engaged in similar conspiracies— should know these crimes are addressed severely wherever and whenever possible to deter them from further engaging in those crimes.

    c. **The Need for Restitution**

Third, the facts here also support the need for restitution. *See* 18 U.S.C. § 1336A. As discussed above, one of the victims gave a detailed account of the financial losses inflicted on him due to the defendant's crimes. Initially, the victim lost property valued at $6,115, which the defendant and his co-conspirators stole from the victim and have not returned. PSR at ¶¶ 57, 60; *see* 18 U.S.C. § 1336A(b)(1)(B). Additionally, the victim lost wages of $18,000 as a result of the offences when he was medically redeployed and cut short his temporary duty, depriving him of four to five months of additional pay entitlements he would have received while serving in Colombia. PSR at ¶ 58; *see* 18 U.S.C. § 1336A(b)(2)(C). Collectively, this amounts to $24,115, which the defendant should be sentenced to pay the victim in restitution for losses resulting from the offense.[3]

    d. **The Sentencing Range and the Need to Avoid Unwarranted Sentence Disparities**

Lastly, the defendant's sentencing range and the need to avoid unwarranted sentence disparities also supports a guideline complaint sentence. 18 U.S.C. § 3553(a)(4)(A), (6). Notably,

---

[3] As noted in the PSR, the victim also suffered a loss in income of $199,535 as a result of a premature retirement due to the ongoing physical and mental health consequences of the crimes. PSR at ¶ 58; *see* 18 U.S.C. § 1336A(b)(2)(C). While this amounts to a real loss attributable to the defendant's crime, the United States is not advocating the lost retirement income be included in the defendant's sentence of restitution.

probation did not identify any other factor that would warrant a departure or variance. PSR at ¶ 169. The defendant is the first of three co-defendants to plead guilty and face sentencing for these crimes. Accordingly, there is not an immediate comparison to his co-conspirators for this case. As such, a Guideline compliant sentence, appropriately accounting for applicable enhancements and reductions, ensures a "sufficient, but not greater than necessary," sentence accounting for the §3553(a) factors.

//

//

//

## V.  CONCLUSION

For the foregoing reasons, the United States respectfully asks the court to impose a sentence of incarceration of 360 months (30 years), three years supervised release, restitution in the amount of $24,115, and a special assessment.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:  _____ For: Hayden
Bertila Fernandez
Assistant United States Attorney
Special Prosecutions
Florida Bar No. 0124092
99 Northeast 4th Street, 5th Floor
Miami, Florida 33132
T. (305) 961-9099
Bertila.Fernandez@usdoj.gov